**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| J.D. HAWTHORNE JR., | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| *versus* | § | CIVIL ACTION NO. H-05-3451 |
| | § | |
| MICHAEL J. ASTRUE, Commissioner | § | |
| of the Social Security Administration, | § | |
| | § | |
| *Defendant.* | § | |

**MEMORANDUM AND ORDER**

Pending before the court are Plaintiff J.D. Hawthorne Jr. ("Hawthorne") and Defendant Michael J. Astrue's, Commissioner of the Social Security Administration ("Commissioner"),[1] cross-motions for summary judgment. Hawthorne appeals the determination of an Administrative Law Judge ("ALJ") that he is not entitled to receive Title XVI supplemental security income benefits. *See* 42 U.S.C. §§ 416(i), 423, 1382c(a)(3)(A). Having reviewed the pending motions, the submissions of the parties, the pleadings, the administrative record, and the applicable law, this Court is of the opinion that Hawthorne's Motion for Summary Judgment (Docket Entry No. 13) should be granted, the Commissioner's Motion for Summary Judgment (Docket Entry No. 14) should be denied, the ALJ's decision denying benefits be reversed, and the case be remanded, pursuant to sentence four, to the Social Security Administration ("SSA") for further proceedings.

---

[1] Michael J. Astrue was sworn in as Commissioner of Social Security on February 12, 2007. Pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure, Michael J. Astrue should therefore be substituted for Jo Anne B. Barnhart (former Commissioner) and Linda S. McMahon (interim acting Commissioner) as the defendant in this suit. No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

I.      *Background*

Hawthorne filed an application for supplemental security income with the SSA on June 26, 2001, claiming that he had been disabled and unable to work since April 14, 1995.  (R. 64, 72).[2] Hawthorne alleges that he suffers from a herniated lumbar disc[3] and discogenic lumbar pain.[4]  (R. 72, 338).  After being denied benefits initially and on reconsideration (R. 33-43), Hawthorne requested an administrative hearing before an ALJ.  (R. 44-45).

A hearing was held on February 24, 2003, in Houston, Texas, at which time the ALJ heard testimony from Hawthorne and Cheryl Swisher, a vocational expert ("VE").  (R. 361-387).  In a decision dated May 8, 2003, the ALJ denied Hawthorne's application for benefits.    (R. 21-29).  On September 22, 2003, Hawthorne appealed the ALJ's decision to the Appeals Council of the SSA's Office of Hearings and Appeals.  (R. 14-16).   After receiving plaintiff's supplemental brief, the Appeals Council, on January 16, 2004, denied Hawthorne's request to review the ALJ's determination.  (R. 10-13).  This rendered the ALJ's opinion the final decision of the Commissioner. *See Sims v. Apfel*, 530 U.S. 103, 107 (2000).  Hawthorne filed this case on October 6, 2005, seeking judicial review of the Commissioner's denial of his claim for benefits.  *See* Docket Entry No. 1.

---

[2]  References made to the administrative record (*e.g.*, transcripts, exhibits, and other documents) will be denoted by a "R" followed by the applicable page number(s).

[3]  "Herniated lumbar disc" is a protrusion of the nucleus pulposus or anulus fibrosus of a lumbar disc, which may impinge on nerve roots.  *See* Dorland's Illustrated Medical Dictionary 814 (29th ed.  2000).

[4]  "Discogenic Lumbar Pain" denotes pain caused by derangement of a lumbar disc.  *See* Dorland's, *supra*, at 510.

II.   *Analysis*

A.   *Statutory Bases for Benefits*

SSI benefits are authorized by Title XVI of the Act and are funded by general tax revenues. *See* SOCIAL SECURITY ADMINISTRATION, SOCIAL SECURITY HANDBOOK, § 2100 (14th ed. 2001). The SSI Program is a general public assistance measure providing an additional resource to the aged, blind, and disabled to assure that their income does not fall below the poverty line. *See* 20 C.F.R. § 416.110. Eligibility for SSI is based upon proof of indigence and disability. *See* 42 U.S.C. §§ 1382(a), 1382c(a)(3)(A)-(C). A claimant applying to the SSI program cannot receive payment for any period of disability predating the month in which he applies for benefits, no matter how long he has actually been disabled. *See Brown v. Apfel*, 192 F.3d 492, 495 n.1 (5th Cir. 1999); *see also* 20 C.F.R. § 416.335. The applicable regulation provides:

> When you file an application in the month that you meet all the other requirements for eligibility, the earliest month for which we can pay you benefits is the month following the month you filed the application. If you file an application after the month you first meet all the other requirements for eligibility, we cannot pay you for the month in which your application is filed or any months before that month.

20 C.F.R. § 416.335. Thus, the month following an application, here, June 2001, fixes the earliest date from which benefits can be paid. (R. 64-66). Eligibility for SSI payments, however, is not dependent on insured status. *See* 42 U.S.C. § 1382(a).

Applicants seeking benefits under either statutory provision must prove "disability" within the meaning of the Act, which defines disability as the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months. *See* 42 U.S.C. §§ 423(d)(1)(A), 1382c(3)(A).

**B.**     *Standard of Review*

**1.**     *Summary Judgment*

The court may grant summary judgment under FED. R. CIV. P. 56(c) when the moving party is entitled to judgment as a matter of law because there is no genuine issue as to any material fact. The burden of proof, however, rests with the movant to show that there is no evidence to support the nonmoving party's case.  If a reasonable jury could return a verdict for the nonmoving party, then a motion for summary judgment cannot be granted because there exists a genuine issue of fact.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

An issue of fact is "material" only if its resolution could affect the outcome of the case.  *See Duplantis v. Shell Offshore, Inc.*, 948 F.2d 187, 189 (5th Cir. 1991).  When deciding whether to grant a motion for summary judgment, the court shall draw all justifiable inferences in favor of the nonmoving party, and deny the motion if there is some evidence to support the nonmoving party's position.  *See McAllister v. Resolution Trust Corp.*, 201 F.3d 570, 574 (5th Cir. 2000).  If there are no issues of material fact, the court shall review any questions of law *de novo.  See Merritt-Campbell, Inc. v. RxP Prods., Inc.*, 164 F.3d 957, 961 (5th Cir. 1999).  Once the movant properly supports the motion, the burden shifts to the nonmoving party, who must present specific and supported material facts, of significant probative value, to preclude summary judgment.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *International Ass'n of Machinists & Aerospace Workers, AFL-CIO v. Compania Mexicana de Aviacion, S.A. de C.V.*, 199 F.3d 796, 798 (5th Cir. 2000).

### 2.    *Administrative Determination*

Judicial review of the Commissioner's denial of disability benefits is limited to whether the final decision is supported by substantial evidence on the record as a whole and whether the proper legal standards were applied to evaluate the evidence. *See Masterson v. Barnhart*, 309 F.3d 267, 272 (5th Cir. 2002). "Substantial evidence" means that the evidence must be enough to allow a reasonable mind to support the Commissioner's decision; it must be more than a mere scintilla and less than a preponderance. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Masterson*, 309 F.3d at 272; *Brown*, 192 F.3d at 496.

When applying the substantial evidence standard on review, the court "scrutinize[s] the record to determine whether such evidence is present." *Myers v. Apfel*, 238 F.3d 617, 619 (5th Cir. 2001) (citations omitted). If the Commissioner's findings are supported by substantial evidence, they are conclusive and must be affirmed. *See Watson v. Barnhart*, 288 F.3d 212, 215 (5th Cir. 2002). Alternatively, a finding of no substantial evidence is appropriate if no credible evidentiary choices or medical findings support the decision. *See Boyd v. Apfel*, 239 F.3d 698, 704 (5th Cir. 2001). The court may not, however, reweigh the evidence, try the issues *de novo*, or substitute its judgment for that of the Commissioner. *See Masterson*, 309 F.3d at 272. In short, "[c]onflicts in the evidence are for the Commissioner and not the courts to resolve." *Id.*

### C.    *ALJ's Determination*

An ALJ must engage in a five-step sequential inquiry to determine whether the claimant is capable of performing "substantial gainful activity," or is, in fact, disabled:

1.    An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of the medical findings. *See* 20 C.F.R. § 416.920(b).

5

2.	An individual who does not have a "severe impairment" will not be found to be disabled. *See* 20 C.F.R. § 416.920(c).

3.	An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors. *See* 20 C.F.R. § 416.920(d).

4.	If an individual is capable of performing the work he has done in the past, a finding of "not disabled" must be made. *See* 20 C.F.R. § 416.920(e).

5.	If an individual's impairment precludes performance of his past work, then other factors, including age, education, past work experience, and residual functional capacity must be considered to determine if any work can be performed. *See* 20 C.F.R. § 416.920(f).

*Newton v. Apfel*, 209 F.3d 448, 453 (5th Cir. 2000); *accord Boyd*, 239 F.3d at 704-05. The claimant has the burden to prove disability under the first four steps. *See Myers*, 238 F.3d at 619. If the claimant successfully carries this burden, the burden shifts to the Commissioner in step five to show that other substantial gainful employment is available in the national economy, which the claimant is capable of performing. *See Masterson*, 309 F.3d at 272; *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994). If the Commissioner is able to verify that other work exists in significant numbers in the national economy that the claimant can perform in spite of his existing impairments, the burden shifts back to the claimant to prove that he cannot, in fact, perform the alternate work suggested. *See Boyd*, 239 F.3d at 705. A finding that a claimant is disabled or is not disabled at any point in the five-step review is conclusive and terminates the analysis. *See id.*

The mere presence of an impairment does not necessarily establish a disability. *See Anthony v. Sullivan*, 954 F.2d 289, 293 (5th Cir. 1992). An individual claiming disability benefits under the Act has the burden to prove that he suffers from a disability as defined by the Act. *See Newton*, 209 F.3d at 452; *Selders v. Sullivan*, 914 F.2d 614, 618 (5th Cir. 1990); *Johnson v. Bowen*, 864 F.2d 340,

343 (5th Cir. 1988); *Cook v. Heckler*, 750 F.2d 391, 393 (5th Cir. 1985).  A claimant is deemed disabled under the Act only if he demonstrates an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  *Shave v. Apfel*, 238 F.3d 592, 594 (5th Cir. 2001); *accord Newton*, 209 F.3d at 452; *Crowley v. Apfel*, 197 F.3d 194, 197-98 (5th Cir. 1999); *Selders*, 914 F.2d at 618; *see also* 42 U.S.C. § 423(d)(1)(A).  "Substantial gainful activity" is defined as work activity involving significant physical or mental abilities for pay or profit.  *See Newton*, 209 F.3d at 452-53; *see also* 20 C.F.R. §§ 404.1572(a)-(b), 416.972.

A medically determinable "physical or mental impairment" is an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques.  *See Hames v. Heckler*, 707 F.2d 162, 165 (5th Cir. 1983); *see also* 42 U.S.C. § 423(d)(3).  "[A]n individual is 'under a disability, only if his impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .'"  *Greenspan*, 38 F.3d at 236 (quoting 42 U.S.C. § 423(d)(2)(A)).  This is true regardless of whether such work exists in the immediate area in which the claimant resides, whether a specific job vacancy exists, or whether the claimant would be hired if he applied.  *See Oldham v. Schweiker*, 660 F.2d 1078, 1083 (5th Cir. 1981); *see also* 42 U.S.C. § 423(d)(2)(A).  In the case at bar, when addressing the first four steps, the ALJ determined:

1.     The claimant has not engaged in substantial gainful activity since the alleged onset of disability.

2.     The claimant has an impairment or a combination of impairments considered "severe" based on the requirements in the Regulations 20 C.F.R. § 416.920(b).

3.     These medically determinable impairments do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulations No. 4.

4.     The undersigned finds the claimant's allegations regarding his limitations are not totally credible for the reasons set forth in the body of the decision.

5.     The undersigned has carefully considered all of the medical opinions in the record regarding the severity of the claimant's impairments (20 C.F.R. § 416.927).

6.     The claimant has the following residual functional capacity to perform the full range of sedentary work.  The claimant can stand or walk up to a total of 2 hours in an 8-hour workday.  The claimant can sit up to a total of 6 hours in an 8-hour workday.  The claimant can lift and carry 10 pounds occasionally. The claimant can use a cane to assist in ambulating.

7.     The claimant's past relevant work as receptionist did not require the performance of work-related activities precluded by his residual functional capacity  (20 C.F.R. § 416.965).

8.     The claimant' s medically determinable back pain and status post back surgeries do not prevent the claimant from performing his past relevant work

9.     The claimant was not under a " disability" defined in the Social Security Act, at any time through the date of the decision.     (20 C.F.R. § 416.920(e)).

(R. 28-29).  Because the ALJ found that Hawthorne could perform his past relevant work, the ALJ did not proceed to step five of the sequential evaluation process.

This Court' s inquiry is limited to a determination of whether there is substantial evidence in the record to support the ALJ' s findings and whether the proper legal standards have been applied.  *See Masterson*, 309 F.3d at 272; *Watson*, 288 F.3d at 215; *Myers*, 238 F.3d at 619; *Newton*, 209 F.3d at 452; *Greenspan*, 38 F.3d at 236; *see also* 42 U.S.C. §§ 405(g), 1383(c)(3).

To determine whether the decision to deny Hawthorne's claim for disability benefits is supported by substantial evidence, the court weighs the following four factors: (1) the objective medical facts; (2) the diagnoses and opinions from treating and examining physicians; (3) the claimant's subjective evidence of pain and disability, and any corroboration by family and neighbors; and (4) the claimant's age, educational background, and work history. *See Martinez v. Chater*, 64 F.3d 172, 174 (5th Cir. 1995); *Wren v. Sullivan*, 925 F.2d 123, 126 (5th Cir. 1991) (citing *DePaepe v. Richardson*, 464 F.2d 92, 94 (5th Cir. 1972)). Any conflicts in the evidence are to be resolved by the ALJ and not the court. *See Newton*, 209 F.3d at 452; *Brown*, 192 F.3d at 496; *Martinez*, 64 F.3d at 174; *Selders*, 914 F.2d at 617.

D.   ***Issues Presented***

Hawthorne contends that the decision of the ALJ is not supported by substantial evidence. Specifically, Hawthorne claims that the ALJ erred by: (1) giving controlling weight to non-examining physicians' opinions; (2) failing to consider various factors in evaluating his treating physician's opinion; (3) not obtaining an updated medical expert opinion concerning medical equivalence; and (4) failing to properly develop the case. *See* Docket Entry No. 13. The Commissioner disagrees with Hawthorne's contentions, maintaining that the ALJ's decision is supported by substantial evidence. *See* Docket Entry No. 15.

E.   ***Review of ALJ's Decision***

1.   ***Objective Medical Evidence and Opinions of Physicians***

When assessing a claim for disability benefits, "[i]n the third step, the medical evidence of the claimant's impairment is compared to a list of impairments presumed severe enough to preclude any gainful work." *Sullivan v. Zebley*, 493 U.S. 521, 525 (1990). If the claimant is not

actually working and his impairments match or are equivalent to one of the listed impairments, he is presumed to be disabled and qualifies for benefits without further inquiry. *See id.* at 532; *see also* 20 C.F.R. § 416.920(d). When a claimant has multiple impairments, the Act requires the Commissioner to " consider the combined effect of all of the individual' s impairments without regard to whether any such impairment, if considered separately, would be of such severity." 42 U.S.C. § 423(d)(2)(B); *Loza v. Apfel*, 219 F.3d 378, 393 (5th Cir. 2000). The relevant regulations similarly provide:

> In determining whether your physical or mental impairment or impairments are of a sufficient medical severity that such impairment or impairments could be the basis of eligibility under the law, we will consider the combined effect of all of your impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity. If we do find a medically severe combination of impairments, the combined impact of the impairments will be considered throughout the disability determination process. If we do not find that you have a medically severe combination of impairments, we will determine that you are not disabled.

20 C.F.R. § 416.923; *see also Loza*, 219 F.3d at 393. The medical findings of the combined impairments are compared to the listed impairment most similar to the claimant' s most severe impairment. *See Zebley*, 493 U.S. at 531.

The claimant has the burden to prove at step three that his impairment or combination of impairments is equivalent to or greater than a listed impairment. *See id.* at 530-31; *Selders*, 914 F.2d at 619. The listings describe a variety of physical and mental illnesses and abnormalities, and are typically categorized by the body system they affect. *See Zebley*, 493 U.S. at 529-30. Individual impairments are defined in terms of several specific medical signs, symptoms, or laboratory test results. *See id.* at 530. For a claimant to demonstrate that his disorder matches an Appendix 1 listing, it must meet *all* of the specified medical criteria. *See id.* An impairment,

no matter how severe, does not qualify if that impairment manifests only some of the specified criteria.  *See id.*

For a claimant to qualify for benefits by showing that his unlisted impairment, or combination of impairments, is equivalent to a listed impairment, he must present medical findings equal in severity to *all* the criteria for the one most similar listed impairment.  *See id.* at 531 (citing 20 C.F.R. § 416.926(a)).  A claimant's disability is equivalent to a listed impairment if the medical findings are at least equal in severity and duration to the listed findings. *See* 20 C.F.R. § 416.926(a).  The applicable regulations further provide:

> (1)(i)   If you have an impairment that is described in the Listing of Impairments in Appendix 1 of Subpart P of this chapter, but—
>
>    (A)   You do not exhibit one or more of the medical findings specified in the particular listing, or
>
>    (B)   You exhibit all of the medical findings, but one or more of the findings is not as severe as specified in the listing;
>
> (ii)   We will nevertheless find that your impairment is medically equivalent to that listing if you have other medical findings related to your impairment that are at least of equal medical significance.

20 C.F.R. § 416.926(a).  Nonetheless, "[a] claimant cannot qualify for benefits under the 'equivalence' step by showing that the overall functional impact of his unlisted impairment or combination of impairments is as severe as that of a listed impairment." *Zebley*, 493 U.S. at 531. Ultimately, the question of equivalence is an issue reserved for the Commissioner.  *See Spellman v. Shalala*, 1 F.3d 357 (5th Cir. 1993); 20 C.F.R. § 416.927(e).

A review of the medical records submitted in connection with Hawthorne's herniated lumbar disc and discogenic back pain reveals that Hawthorne was involved in a job-related injury.

He was first injured in 1984 when he carried a shampoo machine loaded with several gallons of water up the stairway.  (R. 110).  He slipped and fell, hurting his lower back.  (R. 110).  He underwent lumbar laminectomy surgery at L4-5 in 1985 for his back injury.  (R. 281-320).  With physical therapy and medications, he tried to return to work in April 1986 until he subsequently reinjured his back.  (R. 110).  Following this, he underwent surgery in 1986 again at L4-5 on the left.  (R. 110, 281-320).

On November 1, 1993, Frank L. Barnes, M.D. (" Dr. Barnes") visited with Hawthorne to assess his condition and provide answers to a questionnaire required by the United States Department of Labor (" DOL").  (R. 251-252).  Hawthorne was able to walk on his heels and toes and squat slowly.  The straight leg test was painful while sitting only on the left at 90 degrees.  (R. 251).  Dr. Barnes opined that Hawthorne could perform light work, finding that Hawthorne could probably stand and walk two out of eight hours in the work day, lift 20 pounds occasionally and 10 pounds frequently.  (R. 252).

An x-ray was completed on November 11, 1993; no fractures or dislocations were found and the interspaces were well preserved.  (R. 250).  On November 22, 1993, Dr. Barnes released Hawthorne to return to work at light duty noting complaints of pain that had decreased and overall he appeared to be doing better.  (R. 249).  A follow up appointment was scheduled for three weeks later. (R. 249).

On January 3, 1994, Dr. Barnes visited with Hawthorne who was complaining of pain in his back.  (R. 248).  Upon examination, Hawthorne could bend forward about 80 degrees and bend laterally approximately at the waist.  (R. 248).  Dr. Barnes scheduled a follow up visit in one month and opined that Hawthorne might be able to return to his regular work.  (R. 248).

12

Nicholas S. Checkles, M.D. ("Dr. Checkles") performed electrodiagnostic testing, specifically electromyography ("EMG"), on February 16, 1994. (R. 246-247). The EMG test did not demonstrate muscle abnormalities and the nerve conduction test was unable to produce an evoked H-wave, which, Dr. Checkles speculated, was due to Hawthorne being tense during the exam. (R. 246). Following Dr. Checkles testing, Hawthorne visited with Dr. Barnes, on March 7, 1994, who recommended that Hawthorne not return to work. (R. 245).

Dr. Barnes, on March 28, 1994, wrote a letter addressed to Silas M. Crutchfield at the DOL describing Hawthorne's condition. (R. 244). Dr. Barnes described Hawthorne's continuing back pain, spasticity, and 50% normal range of motion. (R. 244). He opined that Hawthorne could return to a limited work activity for two months and then increase to his regular work. (R. 244).

Hawthorne reinjured himself stepping over a curb on April 9, 1994. While his condition improved, on April 18, 1994, he complained about a good deal of pain to Dr. Barnes. (R. 243). Dr. Barnes determined that he could return to work on a limited basis, as long as he did not lift more than 20 pounds and did not bend or stoop. (R. 243).

On June 16, 1994, Hawthorne was referred to John M. Berry, M.D. ("Dr. Berry"). (R. 110). After reviewing Hawthorne's medical history, Dr. Berry determined that Hawthorne had a one-inch well-healed incision on his back and was postoperative from his surgeries in 1985 and 1986. (R. 110-111). During the examination, Hawthorne was limited in flexion to about 50 to 60 degrees. (R. 111). Hawthorne experienced central back pain during his straight leg test raising at 90 degrees bilaterally. (R. 111). When examining his neurologic function, Dr. Berry determined his cranial nerves II-XII were normal. (R. 111). Hawthorne exhibited poor motor

13

performance in the left upper extremity and the left lower extremity.  (R. 111).  His reflexes were 1+ , suppressed, and symmetrical throughout.  (R. 111).  However, his plantar responses were downgoing, his gait was left antalgesic, and he demonstrated pain throughout.  (R. 111).  Before diagnosing Hawthorne, Dr. Berry planned to review an MRI and ordered an MMPI (Minnesota Multiphasic Personality Inventory) to judge any psychological components to the demonstration of his pain and to assess what elements may be contributing to his exam.  (R. 111).  Dr. Berry acknowledged that Hawthorne may have chronic lumbar radiculopathy or mechanical back problem.  (R. 111).

On July 13, 1994, to address Hawthorne's lumbar pain and limited lumbar motion, Dr. Barnes prescribed Skelaxin, Tylenol No. 4 and Sinequan and released him to do light work.  (R. 242).  Soon thereafter, on August 30, 1994, Hawthorne went to the emergency room at St. Joseph Hospital and was examined by Bangalore V. Ramakrishna, M.D. ("Dr. Ramakrishna").  (R. 114-115).  After the straight leg test and x-rays of the lumbosacral spine were negative with no identifiable or soft tissue or bone abnormality, Dr. Ramakrishna administered a pain shot, observed his condition improve, and discharged Hawthorne.  (R. 115, 241).

Hawthorne visited with Dr. Barnes on September 7, 1994, describing a severe increase in his lumbar pain and an increase in his cervical pain.  (R. 240).  Dr. Barnes prescribed him Dolobid and Tylenol No. 4 and he noted Hawthorne should be able to return to work in a couple of weeks.  (R. 240).

On October 24, 1994, Dr. Barnes, in a letter to DOL describing Hawthorne's condition, stating that Hawthorne was experiencing increased pain due to his activity in physical therapy. (R. 239).  Dr. Barnes prescribed him Tylenol 3, Ativan and Motrin.  (R. 239).  Dr. Barnes

14

believed Hawthorne was capable of doing light work and not lifting anything over 15 pounds.  (R. 239).

A functional capacity evaluation was completed on November 14, 1994.  (R. 228-238). Physical therapist Teresa Majesky and a registered occupational therapist Cruz E. Ibarguen found that Hawthorne exhibited work performance at a light-medium work level, which did not satisfy the heavy work level of a warehouse clerk.  (R. 236).  They recommended Hawthorne enter a preconditioning program, followed by a work hardening program.  (R. 237).

On December 27, 1994, Dr. Barnes reported that Hawthorne had returned to light duty or sedentary work but was having problems sitting for eight hours.  (R. 227).  Dr. Barnes counseled him to adjust himself to working since he was out of shape and prescribed him more medication. (R. 227).

On April 22, 1995, Hawthorne visited the emergency room at St. Joseph Hospital.  (R. 112).  At the hospital, Philip Carey Stepaniak, M.D. (" Dr. Stepaniak") examined Hawthorne who complained of pain in his lower back radiating down to his left leg.  (R. 112).  Dr. Stepaniak observed tenderness to palpation over his left sacroiliac joint.  (R. 112).  Hawthorne' s range of motion was limited secondary to pain and he was listing to the right, yet able to sit.  (R. 112). The positive straight leg test demonstrated back pain, not leg pain. (R. 112).  Dr. Stepaniak diagnosed Hawthorne with acute lumbosacral strain/ sprain and possible herniated disc.  (R. 113).

On April 24, 1995, Dr. Barnes recommended that Hawthorne not work for another two weeks to relieve his symptoms.  (R. 224).  An examination demonstrated that he held his spine rigidly, walked with a stooped over posture, and exhibited lumbar spasticity. (R. 224).

An x-ray of Hawthorne's spine was completed on May 8, 1995.  The x-ray revealed trace retrolisthesis[5] of L4-5.  (R. 222).  On May 23, 1995, Dr. Barnes completed the DOL's Record of Examination and Attending Physician's Supplemental Report for Hawthorne describing his lumbar disc displacement and Hawthorne's inability to work.  (R. 219-221).

On June 7, 1995, a consulting orthopedic surgeon, Jose E. Rodriguez, M.D. ("Dr. Rodriguez") expounded his findings after examining Hawthorne in a letter to Dr. Barnes.  (R. 119).  While Dr. Rodriguez was awaiting MRI results, Dr. Rodriguez found Hawthorne to have severe back pain, leg pain with occasional numbness, and difficulty with bladder control.  (R. 120).  Hawthorne exhibited spasms in the spinous musculature and tenderness in the iliolumbar area and SI joints. (R. 121).  The 1993 x-rays demonstrated evidence of laminotomies in the L4-5 segment and probably in the L5-S1 segment and decrease in disc height.  (R. 121).  The 1995 x-rays, when compared to the 1993 x-rays, showed evidence of formation of marginal osteophytes associated with further decrease in height in the L4-5 segment.  (R. 121).

Dr. Barnes wrote to the DOL on August 28, 1995 describing Hawthorne's limited jerky motion and his near inability to move his back at all.  (R. 218).  Dr. Barnes advised the DOL that he had referred Hawthorne for consultation with a " spine expert," Dr. Rodriguez.  (R. 218).  On August 30, 1995, Dr. Rodriguez wrote a letter to the DOL recommending a MRI, bone scan, and psychological evaluation be completed to adequately assess Hawthorne's back and leg pain considering Hawthorne's increased frustration and depression.  (R. 118).

---

[5]  "Retrolisthesis" indicates posterior displacement of one vertebral body on the subjacent body.  *See* DORLAND'S, *supra*, at 1569.

On December 27, 1995, Hawthorne visited Dr. Barnes.  Hawthorne had been bedridden for a week; he experienced increased pain when he was sitting on a toilet seat and exhibited stooped posture and little lumbar motion.  (R. 216-217).  On January 18, 1996, Dr. Barnes noted that he was able to remove his trousers, but during the exam he experienced pain with any motion. (R. 215).

On February 21, 1996, Dr. Rodriguez wrote a letter to the DOL advising them of Hawthorne's condition.  (R. 116).  After viewing an MRI done in September 1995, Dr. Rodriguez determined the MRI showed recurrent disc herniation on L4-5, which is compressing the L5 nerve roots.  (R. 116).  On L3-4, there was a disc herniation that caused indentation on the thecal sac.  (R. 116).  The L5-S1 disc exhibited herniation that did not affect the neural structure, but the three discs were extremely desiccated and degenerated.  (R. 116).  While his bone scan was basically normal, the EMG was positive for denervation on both L5 nerve roots. (R. 116).  These tests correlated with Hawthorne's ongoing symptoms leading Dr. Rodriguez to recommend surgery.  (R. 116).  Furthermore, Dr. Rodriguez assessed Hawthorne as unemployable and probably disabled for heavy work.  (R. 117).

From the period February 12, 1996, until August 18, 1997, Dr. Barnes visited with Hawthorne regularly.  (R. 186-214).  During this period, Hawthorne's symptoms were unchanged with continued back and leg pain.  (R. 186-214).  Hawthorne was awaiting approval of the surgery Dr. Rodriguez recommended and Dr. Barnes supported.  (R. 212).  In the interim, Dr. Barnes continued to prescribe Ace bandages, Motrin 800, Soma, and Tylenol 4 for pain relief. (R. 186-214).

17

On November 21, 1997, Hawthorne visited Dr. Barnes describing continued back pain and leg pain. (R. 186). Hawthorne wrapped his legs with Ace bandages to reduce the pain. (R. 186). On March 9, 1998, Dr. Barnes described Hawthorne's progress as nil and his symptoms worsening. (R. 183). Dr. Barnes continued to prescribe Ace bandages and medication, including Tylenol 4 and Motrin 800. (R. 183).

On May 4, 1998, Dr. Barnes assessed Hawthorne and found more protrusion at the lumbar spine and lumbar muscles more prominent. (R. 181). Hawthorne was still awaiting approval for his surgery and was denied authorization to attend a pain clinic by the DOL. (R. 179).

A medical imaging report, on September 3, 1998, was produced for Hawthorne. (R. 176). The report described slight degenerative changes, scoliosis in the lumbar spine, anterior wedging at T12 and slightly at L1, and calcification in the abdominal aorta. (R. 176). The report found a suggested clinical correlation to age. (R. 176).

On September 8, 1998, Carol Strickland, M.D. ("Dr. Strickland") provided Hawthorne with an internal medicine consultative examination. Based on Dr. Strickland's radiographic studies, Hawthorne's lumbar spine demonstrated slight degenerative changes, anterior wedging at T12, and slight anterior wedging at L1. (R. 175). On inspection of his back, Dr. Strickland found tenderness when sitting, light palpitation, and mild discomfort in the lumbar areas. (R. 175). Hawthorne was able to bend at the waist 45 degrees and could perform minimum squatting, but could not proceed further with both movements due to pain. (R. 175). Neurologically, Hawthorne had no noted muscular atrophy, his gait had a mild limp, and he used a cane on an as-needed basis when the pain was severe. (R. 175). Due to pain, he was unable to perform the heel-walk, toe-walk, hop or tandem walk. (R. 175).

18

In November 1998, Dr. Barnes met with Hawthorne and found limited lumbar motion at flex 20 degrees, lumbar tenderness, and spasms. (R. 171). These symptoms continued on Hawthorne's visit on January 7, 1999 along with continued back and leg pain. (R. 170).

On May 7, 1999, Dr. Barnes described Hawthorne as disabled from any type of work since 1995 due to back pain which had been consistent and persistent. (R. 165). Also, Dr. Barnes, on June 11, 1999, wrote a letter describing the history of Hawthorne's condition. He detailed the relief he received from a lumbar laminectomy in 1986, which allowed him to return to a sedentary level of work. (R. 110, 163). He further noted that Hawthorne's back pain persisted and he had become resistant to therapy. (R. 163). Dr. Barnes recounted that as of April 1995, Hawthorne had been unable to work due to his back pain and Dr. Rodriguez had recommended further surgery. (R. 163).

On July 1, 1999, Dr. Barnes reported limited motion in Hawthorne's back and prescribed Ace bandages to relieve his leg pain. (R. 161). On his August 2, 1999, visit with Dr. Barnes, Hawthorne described increased pain after he lifted his child and continued leg pain. (R. 159). With continued symptoms, on December 27, 1999, Dr. Barnes diagnosed him with lumbar disc disease and referred Hawthorne back to Dr. Rodriguez. (R. 152).

On January 31, 2000, Dr. Barnes wrote a letter to the DOL stating Hawthorne's lumbar pain was quite severe with no change in his physical findings. (R. 148). Dr. Barnes reported Hawthorne was walking with a cane. (R. 150). Less than a month later, on February 21, 2000, Hawthorne complained to Dr. Barnes that he was experiencing more pain and it was hard to get out of bed. (R. 146). Dr. Barnes ordered a lumbar epidural steroid injection and renewed Hawthorne's medications. (R. 146). On March 8, 2000 Hawthorne received the left L5-S1

transforaminal epidural steroid injection.  (R. 144).  The procedure was successful; however, he received no relief of the usual type in the lower back and left leg pain 90 minutes after the procedure was completed.  (R. 145).

On May 1, 2000, Dr. Barnes updated the DOL in a letter of Hawthorne's unchanged condition and Hawthorne's continued wait for approval for his spine surgery.  (R. 137).  Dr. Barnes renewed his medication and noted his plan to begin reducing his medications, but he did not release him to return to work.  (R. 137).  On May 31, 2000, Hawthorne visited Dr. Barnes' office describing his back as "bad."  (R. 134).   Hawthorne visited Dr. Barnes describing worsening pain and insomnia on July 20, 2000.  (R. 133).  He was unable to return to work and, as of July 19, 2000, Hawthorne had hired a lawyer.  (R. 133).

On October 16, 2000, Hawthorne visited Dr. Barnes and described the same symptoms.  (R. 131).  He was prescribed Soma, Tylenol, Colace, and Motrin to control the pain and was not released to work.  (R. 131).  Dr. Barnes also ordered an elastic bandage to reduce his knee pain and leg pain.  (R. 132).

On November 7, 2000, Hawthorne called Dr. Barnes' office questioning why surgery had not been approved by his insurance.  (R. 130).  Hawthorne's chart did not indicate surgery had been ordered.  (R. 130).  Hawthorne contacted his insurance and his insurance, consequently, contacted Dr. Barnes' office.  (R. 130).  Based on these conversations, Dr. Rodriguez' recommendation for spinal surgery was sent to his insurance company. (R. 130).

On November 13, 2000, Dr. Barnes assessed Hawthorne's lumbar disc disease, prescribed additional medication, and determined Hawthorne was unable to return to work.  (R. 129).  On January 22, 2001, and September 12, 2001, Dr. Barnes met with Hawthorne and observed the

20

same symptoms of little voluntary lumbar motion and muscular guarding.  (R. 123, 127).  In both

visits, Dr. Barnes described Hawthorne's work capacity as sedentary.  (R. 123, 127).  During

the January 22, 2001, visit, Dr. Barnes reiterated the diagnosis of lumbar disc disease, continued

to prescribe Tylenol, Motrin, Soma and Colace, but released Hawthorne to return to sedentary

work on a limited basis. (R. 128).

On October 26, 2001, Walter Buell, M.D. (" Dr. Buell"), with the Social Security

Administration, issued a technical denial for Hawthorne's disability claim for lumbar disc

disease.  (R. 253).  Dr. Buell stated that the alleged limitations were not fully supported by his

file.  (R. 253).

On December 20, 2001, Donald Gibson II, M.D. (" Dr. Gibson") was hired by the

Disability Determination Services with the Texas Rehabilitation Commission. (R. 254-256).  Dr.

Gibson described Hawthorne's back pain as mild and believed Hawthorne's level of pain did not

correlate with x-ray findings.  (R. 256).  Dr. Gibson diagnosed Hawthorne with post laminectomy

syndrome with mild degenerative changes.  (R. 256).  Upon examining his back, Dr. Gibson

found tenderness in the lower lumbar spine with slight spasms.  (R. 256).  When slight pressure

was applied, Dr. Gibson observed severe guarding and hyperflexion in the back.  (R. 256).

Hawthorne was able to complete 90 degrees of the forward flexion of the lumbar spine and the

straight leg test was negative.  (R. 256).  Hawthorne's x-ray indicated diffuse degenerative

changes throughout the lumbar spine with disc space narrowing, degenerative changes of the facet

joints, and mild calcification of the abdominal aorta. (R. 256).

Beginning October 22, 2001, to February 6, 2002, Hawthorne visited with Dr. Barnes

describing severe back pain.  (R. 278-280).  Dr. Barnes prescribed medication and an additional

back brace (R. 178-280).  Dr. Barnes wrote a letter to the DOL on April 2, 2002, requesting reconsideration of the DOL's April 1 denial of Hawthorne's lumbar spine surgery recommended by Dr. Rodriguez[6] and himself.  (R. 276-277).

R. S. Rosenberger, M.D. ("Dr. Rosenberger") completed a Functional Capacity Assessment on January 30, 2002.  (R. 257-264).  He determined that the allegations of a disability were not supported by the evidence.  (R. 263).  Dr. Rosenberger diagnosed Hawthorne with mild degenerative disc disease.  (R. 257, 264).  He found Hawthorne experienced TTP in the lumbar spine and slight spasms with exaggerated response to light touch.  (R. 264).  Hawthorne was able to flex 90 degrees and reach under his chair to pick up medication.  (R. 264).  Dr. Rosenberger determined his exertional limitations to be occasionally lifting 50 pounds, frequently lifting 25 pounds, sitting for about six hours in an eight-hour workday, and pushing and pulling limited in the upper extremities.  (R. 258).

From June 17, 2002, until January 27 2003, Dr. Barnes met with Hawthorne six times addressing his continued severe back and leg pain.  (R. 266-275).  Hawthorne was walking with a cane and stooped over.  (R. 266, 322).  He requested a new back brace, asserting that his previous brace was worn out.  (R. 268).  As of September 9, 2002, Hawthorne's operation had still not been approved.  (R. 271, 274).

On November 24, 2002, the Radiology Services Consultation at Harris County Hospital District reviewed Hawthorne's radiology images.  (R. 337).  The report indicated loss of anterior vertebral body height at the T12 and L1 levels, which appeared chronic with loss of disc space

---

[6] The medical record denoted Dr. Ramirez (R. 276-277); however, this appears to be a typographical error, as the bulk of the record refers to Dr. Rodriguez as the doctor recommending lumbar spine surgery.  (R. 116).

at the T12/L1 level.  (R. 337).  Also, in the abdominal aorta and bilateral common iliac arteries there was atherosclerotic calcifications.  (R. 337).

On February 14, 2003, Dr. Barnes completed a Lumbar Spine Residual Functional Capacity Questionnaire.  (R. 338).  Dr. Barnes, after treating Hawthorne almost monthly since 1986 monthly, concluded Hawthorne's diagnosis to be a recurrent herniated lumbar disc and discogenic lumbar pain increasing since 1994.  (R. 338).  According to Dr. Barnes, during a work day, Hawthorne could sit or stand for 30 minutes at one time.  (R. 340).  Hawthorne must walk 10 minutes every hour.  He could carry 10 lbs. frequently and 20 lbs. occasionally.  (R. 341).  Furthermore, Dr. Barnes completed a Spinal Nerve Root Compression Listing §1.04A.  Dr. Barnes identified the disorder of the spine to be lumbar disc herniation with evidence of nerve root compression. (R. 343).  Hawthorne experienced limited motion of the spine with 40 degrees flexion, 10 degrees extension, 10 degrees lateral bending right, and 10 degrees lateral bending left.  (R. 343).  Dr. Barnes stated, "[h]is severe lumbar pain prevents him fulfilling all the requirements of a sedentary worker in a competitive workplace."  (R. 344).

"[O]rdinarily the opinions, diagnoses, and medical evidence of a treating physician who is familiar with the claimant's injuries, treatments, and responses should be accorded considerable weight in determining disability." *Greenspan*, 38 F.3d at 237; *accord Myers*, 238 F.3d at 621; *Loza*, 219 F.3d at 395; *Scott v. Heckler*, 770 F.2d 482, 485 (5th Cir. 1985).  The opinion of a specialist generally is accorded greater weight *than* that of a non-specialist.  *See Newton*, 209 F.3d at 455; *Paul v. Shalala*, 29 F.3d 208, 211 (5th Cir. 1994), *overruled on other grounds by Sims v. Apfel*, 530 U.S. 103, 108 (2000).  Medical opinions are given deference, however, only if those opinions are shown to be more than conclusory and supported by clinical and laboratory

findings.  *See Scott*, 770 F.2d at 485.  Moreover, a treating physician's opinions are far from

conclusive and may be assigned little or no weight when good cause is shown.  *See Myers*, 238

F.3d at 621; *Loza*, 219 F.3d at 395; *Greenspan*, 38 F.3d at 237.  Good cause may permit an ALJ

to discount the weight of a treating physician's opinion in favor of other experts when the treating

physician's evidence is conclusory, unsupported by medically acceptable clinical, laboratory, or

diagnostic techniques, or is otherwise unsupported by the evidence.  *See Myers*, 238 F.3d at 621;

*Newton*, 209 F.3d at 456; *see also Brown*, 192 F.3d at 500; *Greenspan*, 38 F.3d at 237; *Paul*,

29 F.3d at 211.  It is well settled that even though the opinion and diagnosis of a treating

physician should be afforded considerable weight in determining disability, the ALJ has sole

responsibility for determining a claimant's disability status.  *See Paul*, 29 F.3d at 211; *accord*

*Myers*, 238 F.3d at 621; *Newton*, 209 F.3d at 455.

In the case at bar, based on the objective medical facts and opinions of physicians, the

ALJ's decision is not supported by substantial evidence.  The ALJ improperly discounted the

opinions of Hawthorne's physicians, Drs. Barnes and Rodriguez, without sufficient rationale

and/or explanation.  *See* 20 C.F.R. § 416.927.  The ALJ did not properly assess the factors in

deciding the weight to give any medical opinion.  20 C.F.R. § 416.927.  As set forth in the

administrative record and summarized above, Dr. Barnes documented years of Hawthorne's

treatment for increasing back and leg pain.  Indeed, objective findings documented degenerative

changes, anterior wedging, laminotomies, retrolisthesis, and decreased lumbar height.  (R.121,

176, 222).  Additionally, Dr. Barnes' findings were confirmed by orthopedic specialist Dr.

Rodriguez.  (R. 118-120, 218).  The ALJ, however, inexplicably relies on the one-time consulting

examination of Dr. Gibson to deny Hawthorne benefits.  Dr. Gibson's assessment does not

comport with the record evidence.   Because the ALJ expressly discounted the opinions of Hawthorne's treating physicians without sufficient explanation, the ALJ's decision is not supported by substantial evidence and must be remanded for a proper examination of the evidence. It may be of benefit to the ALJ to have a medical expert present at any new administrative hearing to review and evaluate the medical evidence.

### 2.   *Subjective Complaints*

The law requires the ALJ to make affirmative findings regarding a claimant's subjective complaints.   *See Falco v. Shalala*, 27 F.3d 160, 163 (5th Cir. 1994) (citing *Scharlow v. Schweiker*, 655 F.2d 645, 648-49 (5th Cir. 1981)).   When a plaintiff alleges disability resulting from pain, he must establish a medically determinable impairment that is capable of producing disabling pain.   *See Ripley*, 67 F.3d at 556 (citing 20 C.F.R. § 404.1529).   Once a medical impairment is established, the subjective complaints of pain must be considered along with the medical evidence in determining the individual's work capacity.   *See id.*   It is well settled that an ALJ's credibility findings on a claimant's subjective complaints are entitled to deference. *See Chambliss v. Massanari*, 269 F.3d 520, 522 (5th Cir. 2001); *Scott v. Shalala*, 30 F.3d 33, 35 n.2 (5th Cir. 1994); *Falco*, 27 F.3d at 164; *Wren*, 925 F.2d at 128.   The Fifth Circuit recognizes that "the ALJ is best positioned" to make these determinations because of the opportunity to observe the claimant first-hand.   *See Falco*, 27 F.3d at 164 n.18.   Moreover, "[t]he Act, regulations and case law mandate that the Secretary require that subjective complaints be corroborated, at least in part, by objective medical findings."   *Harrell v. Bowen*, 862 F.2d 471, 481 (5th Cir. 1988) (citing 42 U.S.C. § 423(d)(5)(A); 20 C.F.R. § 404.1529; *Owens v. Heckler*, 770 F.2d 1276, 1281-82 (5th Cir. 1985)); *accord Chambliss*, 269 F.3d at 522 (citing *Houston v.*

*Sullivan*, 895 F.2d 1012, 1016 (5th Cir. 1989)); *Hampton v. Bowen*, 785 F.2d 1308, 1309 (5th Cir. 1986).

Here, the medical records and Hawthorne's testimony at the administrative hearing set forth his complaints of pain. Hawthorne testified during the administrative hearing to experiencing a high level of pain that medicine sparsely alleviated. (R. 366-72). The record provides ample treatment notes, at times recorded monthly, from Dr. Barnes reciting Hawthorne's complaints of pain. During the administrative hearing, Hawthorne felt pain and he asked permission to stand to alleviate his pain. (R. 372). Both Drs. Barnes and Rodriguez have recommended back surgery for Hawthorne in hopes of alleviating his pain (R. 116, 163, 276-77), but the surgery has not been approved by the DOL. (R. 130, 137, 179, 212).

The ALJ, however, found Hawthorne's subjective complaints and testimony were not generally credible. (R. 28). In fact, during the hearing, the ALJ incredulously compared his personal back injuries and pain to Hawthorne's condition. (R. 386-87).

> Right now those, I mean those x-rays I don't find them to be very bad. I mean mine looks a heck of lot worst than his does. I mean I have a herniated disc from the x-ray so, you know when I see disc spaced – I have nearly all that much worst than you do and I do heavy labor. Did it this weekend so I need some more.

(R. 386-87). A comparison of the ALJ's pain tolerance and x-rays to Hawthorne's is an improper evaluation of evidence. *See* 42 U.S.C. § 423(d)(5)(A); 20 C.F.R. § 416.929.

Moreover, the ALJ, citing Dr. Gibson's consultation, found that Hawthorne was able to reach under his chair to pick up his medication. (R. 26, 256). This one time observation by Dr. Gibson, however, is not dispositive of Hawthorne's level of pain and does not constitute substantial evidence to assess Hawthorne's subjective complaints of pain. In view of the ample

records documenting Hawthorne's pain by numerous doctors, the ALJ's decision discounting Hawthorne's pain is not supported by substantial evidence.

### 3.   *Residual Functional Capacity*

Under the Act, a person is considered disabled:

> . . . only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work. . . .

42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).  The Commissioner bears the burden of proving that a claimant's functional capacity, age, education, and work experience allow him to perform work in the national economy.  *See Brown v. Yuckert*, 482 U.S. 137, 146 n.5 (1987); *see also Masterson*, 309 F.3d at 272; *Watson*, 288 F.3d at 216; *Myers*, 238 F.3d at 619; *Greenspan*, 38 F.3d at 236.   If the Commissioner fulfills this burden by pointing out potential alternative employment, the claimant, in order to prevail, must prove that he cannot perform the alternate work suggested.  *See Masterson*, 309 F.3d at 272; *Boyd*, 239 F.3d at 705; *Shave*, 238 F.3d at 594; *Carey v. Apfel*, 230 F.3d 131, 135 (5th Cir. 2000).

To determine whether a claimant can return to a former job, the claimant's "residual functional capacity" must be assessed.  *See Moore v. Sullivan*, 895 F.2d 1065, 1068 (5th Cir. 1990); *see also* 20 C.F.R. § 404.1545.  This term of art merely represents an individual's ability to perform activities despite the limitations imposed by an impairment.  *See Villa v. Sullivan*, 895 F.2d 1019, 1023 (5th Cir. 1990); *see also* 20 C.F.R. § 404.1545.  Residual functional capacity combines a medical assessment with the descriptions by physicians, the claimant or others of any

limitations on the claimant's ability to work.  *See Elzy v. Railroad Retirement Bd.*, 782 F.2d 1223, 1225 (5th Cir. 1986); *see also* 20 C.F.R. § 404.1545.   When a claimant's residual functional capacity is not sufficient to permit him to continue his former work, then his age, education, and work experience must be considered in evaluating whether he is capable of performing any other work.  *See Boyd*, 239 F.3d at 705; 20 C.F.R. § 404.1520.  The testimony of a vocational expert is valuable in this regard, as "he is familiar with the specific requirements of a particular occupation, including working conditions and the attributes and skills needed." *Fields v. Bowen*, 805 F.2d 1168, 1170 (5th Cir. 1986); *accord Carey*, 230 F.3d at 145; *see also Vaughan v. Shalala*, 58 F.3d 129, 132 (5th Cir. 1995).

In evaluating a claimant's residual functional capacity, the Fifth Circuit has looked to SSA rulings ("SSR").  *See Myers*, 238 F.3d at 620.  The Social Security Administration's rulings are not binding on this court, but they may be consulted when the statute at issue provides little guidance.  *See id.*  In *Myers*, the Fifth Circuit relied on SSRs addressing residual functional capacity and exertional capacity.  *See id.*  In that case, the court explained:

> First, SSR 96-8p provides that a residual functional capacity (RFC) is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis.  A regular and continuing basis means 8 hours a day, for 5 days a week, or an equivalent work schedule.  The RFC assessment is a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities.  However, without the initial function-by-function assessment of the individual's physical and mental capacities, it may not be possible to determine whether the individual is able to do past relevant work. . . .   RFC involves both exertional and non-exertional factors.   Exertional capacity involves seven strength demands: sitting, standing, walking, lifting, carrying, pushing, and pulling.  Each function must be considered separately.  In assessing RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis. . . .  The RFC assessment must include a resolution of any inconsistencies in the evidence.

*Id.* (internal citations omitted); *see* 61 Fed. Reg. 34474-01 (July 2, 1996).  The court further

commented:

> Second, SSR 96-9p also provides that initially, the RFC assessment is a function-by-function assessment based upon all of the relevant evidence of an individual's ability to perform work-related activities. . . .  The impact of an RFC for less than a full range of sedentary work is especially critical for individuals who have not yet attained age 50.  Since age, education, and work experience are not usually significant factors in limiting the ability of individuals under age 50 to make an adjustment to other work, the conclusion whether such individuals who are limited to less than the full range of sedentary work are disabled will depend primarily on the nature and extent of their functional limitations or restrictions.

*Id.* (internal citations omitted); *see* 61 Fed. Reg. 34478 (July 2, 1996).  The court also noted that

SSR 96-9p defines "exertional capacity" as the aforementioned seven strength demands and

requires that the individual's capacity to do them on a regular continuing basis be stated.  *See id.*

To determine that a claimant can do a given type of work, the ALJ must find that the claimant can

meet the job's exertional requirements on a sustained basis.  *See Carter v. Heckler*, 712 F.2d

137, 142 (5th Cir. 1983) (citing *Dubose v. Matthews*, 545 F.2d 975, 977-78 (5th Cir. 1977)).

    In the case at bar, the ALJ's findings were based solely on the hypothetical question the

ALJ presented to the VE.  The ALJ hypothetical set forth the following hypothetical question to

the VE:

> Q:    Okay.  Then assume for me an individual who could stand or walk two hours in an 8-hour day with normal breaks or sit for six.  Be able to lift or carry 10 pounds occasionally, walks with a cane.  Could such an individual do any of the past work that you've described?
>
> A:    Yes, Your Honor, the receptionist position would still be intact under this hypothetical.

(R. 382-83).   On cross-examination of the VE, Hawthorne's attorney included additional

limitations as set forth in Hawthorne's medical records:

Q:     The individual must walk 10 minutes out of every hour.  Now every, every hour he must take a 10-minute – he must walk for 10 minutes, requires the ability to shift at will from sitting, standing, walking.  Has the most – can stand, walk two hours on an 8-hour day, sit about six hours or at least six hours in an 8-hour day.  Can rarely twist, never stoop, rarely crouch, squat, unable to climb stairs and would be at the sedentary exertional level and I' ll stop right there for a moment.   Would that claimant be capable of performing past relevant work.

A:     Well you mentioned walking.  The person must actually walk 10 minutes, is that what you' re saying?  The person should walk – well no the person could not perform this position if he' s having to walk because the, the nature of the position is to be at the phone answering the phone.

(R. 383-84).  When these limitations were incorporated in the hypothetical, the VE concluded that Hawthorne would not be able to perform his previous employment.  (R. 383-384).  Because the ALJ' s hypothetical question to the VE failed to account for Hawthorne' s inability to sit for an entire hour it was fundamentally flawed.  *See Steele v. Barnhart*, 290 F.3d 936, 942 (7th Cir. 2002).  (R. 383-384).  As such, the ALJ' s decision, which relies on the VE' s testimony that Hawthorne can perform his past relevant work is not supported by substantial evidence.

**III.**     *Conclusion*

Accordingly,  it is therefore

**ORDERED** that Hawthorne' s Motion for Summary Judgment (Docket Entry No. 13) is **GRANTED**.   It is further

**ORDERED** that the Commissioner' s Motion for Summary Judgment (Docket Entry No. 14) is **DENIED**.   It finally

**ORDERED** that the case is **REVERSED** and **REMANDED** to the Commissioner for a new hearing on the following: development, if necessary by a medical doctor, regarding Hawthorne' s herniated lumbar disc and discogenic lumbar pain; proper consideration of the

extent of pain experienced by Hawthorne and work limitations, if any, such pain imposes on Hawthorne; formulation of clear testimony from a VE regarding jobs, if any, Hawthorne is capable of performing considering all of his limitations.

**SIGNED** at Houston, Texas, this 19th day of March, 2007.

Calvin Botley
United States Magistrate Judge